UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
PENG LIN, MIRACLE CURTAINS, INC. and　　:
MIRACLE CURTAINS 1, INC.,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiffs,　　　　:　　　　　　　**ORDER**
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　-against-　　　　　　　　　　:　　　　　19 Civ. 5627 (VMS)
　　　　　　　　　　　　　　　　　　　　　　:
MIRACLE CURTAINS, NY, INC., MIRACLE　　:
WINDOW FASHION, INC., MIRACLE　　　　　:
CURTAINS KC, INC., KE ZHONG GUAN　　　:
A/K/A KEN GUAN and QU WEIRONG,　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　　　:
------------------------------------------------------------- x

**Vera M. Scanlon, United States Magistrate Judge:**

　　　　Plaintiffs Peng Lin, Miracle Curtains, Inc. and Miracle Curtains 1, Inc. ("Plaintiffs")

bring this trademark infringement action against Defendants Miracle Curtains, NY, Inc.; Miracle

Window Fashion, Inc.; Miracle Curtains KC, Inc.; Ke Zhong Guan a/k/a Ken Guan; and Qu

Weirong ("Defendants").  See ECF No. 22.  Before the Court is Plaintiffs' motion for summary

judgment.  See ECF No. 49.[1]  Defendants opposed.  See ECF No. 50.[2]  Plaintiffs replied.  See

---

[1] Plaintiffs' opening papers include Notice of Motion, ECF No. 49; Plaintiffs' Rule 56.1 Statement ("Pls.' Rule 56.1 Stmt."), ECF No. 49-24; Declaration of Adam Koblenz ("Koblenz Decl."), ECF No. 49-1, and Exhibits 1-8 annexed thereto, ECF Nos. 49-2 through 49-9; Declaration of Peng Lin ("Lin Decl."), ECF No. 49-10, and Exhibits A-L annexed thereto, ECF Nos. 49-11 through 49-22; and Plaintiffs' Memorandum in Support ("Memo."), ECF No. 49-23.

[2] Defendants' opposition papers include Defendants' Rule 56.1 Counter Statement ("Defs.' Rule 56.1 Counter Stmt."), ECF No. 50-59; Declaration of Ke Zhong Guan ("Guan Decl."), ECF No. 50-1, and Exhibits 1-8 annexed thereto, ECF Nos. 50-2 through 50-9; Declaration of Qu Weirong ("Weirong Decl."), ECF No. 50-10, and Exhibits 1-8 annexed thereto, ECF Nos. 50-11 through 50-18; Declaration of Bing Li ("Li Decl."), ECF No. 50-19, and Exhibits 1-36 annexed thereto, ECF Nos. 50-20 through 50-55; and Defendants' Memorandum in Opposition ("Opp."), ECF No. 50.

ECF No. 51.[3]  For the following reasons, Plaintiffs' motion for summary judgment is denied.

The Court also declines to <u>sua</u> <u>sponte</u> enter summary judgment in favor of Defendants.

## I.    BACKGROUND

### a.  Procedural History

Plaintiffs commenced this action in late 2019, and they filed an amended complaint on

February 28, 2020.  <u>See</u> ECF Nos. 1, 22.  Plaintiffs seek compensatory and punitive damages,

injunctive relief and attorneys' fees and costs.  <u>See</u> ECF No. 22 at 19-21.  Plaintiffs moved for

summary judgment, which Defendants opposed.  <u>See</u> Memo., Opp., Reply.

### b.  The Parties' Rule 56.1 Statements

Rule 56.1(a) of the Local Civil Rules of the Eastern District of New York requires a party

moving for summary judgment to submit a "short and concise statement, in numbered

paragraphs, of the material facts as to which the moving party contends there is no genuine issue

to be tried."  The non-moving party, in turn, must submit "a correspondingly numbered

paragraph responding to each numbered paragraph in the statement of the moving party, and if

necessary, additional paragraphs containing a separate, short and concise statement of additional

material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ.

R. 56.1(b).  The responses by the non-moving party that attempt to "controvert[] any statement

of material fact" asserted by the moving party must be supported by a "citation to evidence

which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Civ. R.

56.1(d).  "If the opposing party [] fails to controvert a fact so set forth in the moving party's Rule

56.1 statement, that fact will be deemed admitted."  <u>Giannullo v. City of New York</u>, 322 F.3d

---

[3] Plaintiffs' reply papers include Plaintiffs' Reply Memorandum ("Reply"), ECF No. 51; Second
Declaration of Adam Koblenz ("Koblenz Decl. II") with one exhibit, ECF No. 51-1; and the
Second Declaration of Peng Lin ("Lin Decl. II") with one exhibit, ECF No. 51-2.

139, 140 (2d Cir. 2003) (citation omitted).

Defendants admit or admit in part 52 of Plaintiffs' 88 statements, dispute or dispute in part 34 of the statements and object to 5 of the statements.  See generally Defs.' Rule 56.1 Counter Stmt.  Defendants do not write out in narrative form precisely what they dispute for 33 of Plaintiffs' statements; they only respond by referring the Court to the record.  See id. Defendants do not provide their own separate statement of facts as allowed by Local Civil Rule 56.1(b).  The Court summarizes the relevant facts using Plaintiffs' Rule 56.1 Statement and Defendants' responses thereto, as well as the portions of the record evidence the parties have brought to the Court's attention.  See Fed. R. Civ. P. 56(c)(3).

### i. Undisputed Facts

#### a. The Plaintiffs

Plaintiff Peng Lin ("Lin") is an individual who resides in Little Neck, New York.  Lin Decl. ¶ 1.  Lin is married to Ke Yan Guang ("Guang"), who is the sister of Defendant Ze Khong Guan a/k/a Ken Guan.  Guan Decl. ¶¶ 9, 12.

Plaintiff Miracle Curtains, Inc. ("MC") is a New York domestic business corporation, was established on July 1, 2013, and is a home interior design business that sells and installs curtains, blinds, drapes, shades and other related merchandise at residential and commercial properties throughout the Tri-State area.  Lin Decl. ¶¶ 5-6.  MC's retail store was formerly located at 36-51 College Point Boulevard, Flushing, New York 11354.  Id. ¶ 6; see Koblenz Ex. 5 at 26:8-11.

Plaintiff Miracle Curtains 1, Inc. ("MC 1") is a New York domestic business corporation, was established on July 18, 2017, and is a home interior design business that sells and installs curtains, blinds, drapes, shades and other related merchandise at residential and commercial

properties throughout the Tri-State area. Lin Decl. ¶¶ 10, 12. MC 1 became fully operational in or about October 2017. Id. ¶ 10. Compared to MC, MC 1 is larger in size and in its capabilities, providing a wider variety of curtains, drapery and other related accessories and services. Id. ¶ 13.

### b.  The Defendants

Defendant Ze Khong Guan a/k/a Ken Guan ("Guan") is an individual who resides in the County of Queens, State of New York. See ECF No. 31 ¶ 6. Guan is Lin's brother-in-law. Lin Decl. ¶ 17; Koblenz Ex. 5 at 11:21-22. Guan is the sole shareholder of Defendant Miracle Curtains NY, Inc. ("MCNY") and Defendant Miracle Curtains KC, Inc. ("MCKC"). Koblenz Ex. 5 at 21:11-15, 79:10-21, 80:9-13.

Qu Weirong ("Weirong") is an individual who resides in the County of Queens, State of New York. See ECF No. 31 ¶ 7. Weirong is Guan's wife. Lin Decl. ¶ 20; Koblenz Ex. 5 at 23:18-22. Weirong is the sole shareholder of Defendant Miracle Window Fashion, Inc. ("MW"). Koblenz Ex. 5 at 23:23-24:2.

Defendant MCNY is a New York domestic business corporation, was established on March 16, 2017, and is a home interior design business that sells and installs curtains, blinds, drapes, shades and other related merchandise at residential and commercial properties throughout the Tri-State area. Lin Decl. ¶¶ 25, 27; see Koblenz Ex. 4 ¶ 23; Koblenz Ex. 5 at 20:17-20. MCNY's retail store is located at 42-20 College Point Boulevard, Flushing, New York 11355. Lin Decl. ¶ 27; Koblenz Ex. 5 at 20:21-24; Koblenz Ex. 4 ¶ 14. MCNY was and is MC's and MC 1's direct competitor. Lin Decl. ¶ 29; Koblenz Ex. 5 at 30:3-10; Koblenz Ex. 4 ¶ 23.

Defendant MW was a New York domestic business corporation, was established on April 9, 2015, and was a home interior design business that sold and installed curtains, blinds, drapes,

4

shades and other related merchandise at residential and commercial properties throughout the Tri-State area.  Lin Decl. ¶¶ 25-26; Koblenz Ex. 5 at 22:19-23:3; Koblenz Ex. 4 ¶ 23.  MW's retail store was located at 2 Allen Street, New York, New York 10002.  Lin Decl. ¶ 26; Koblenz Ex. 5 at 23:4-5.  MW ceased business operations in or about September 2020.  See Pls.' Rule 56.1 Stmt. ¶ 32; Defs.' Rule 56.1 Counter Stmt. ¶ 32; Koblenz Ex. 5 at 21:23-22:3.  MW was MC's and MC 1's direct competitor.  Lin Decl. ¶ 29; Koblenz Ex. 5 at 30:3-10; Koblenz Ex. 4 ¶ 23.  Guan and/or Weirong owned and operated MW while working for MC.  See Lin Decl. ¶ 30; Koblenz Ex. 4 ¶ 15; Pls.' Rule 56.1 Stmt. ¶ 34; Defs.' Rule 56.1 Counter Stmt. ¶ 34.

Defendant Miracle Curtains KC, Inc. ("MCKC") is a New York domestic business corporation, was established on July 11, 2018, and is a home interior design business that sells and installs curtains, blinds, drapes, shades and other related merchandise at residential and commercial properties throughout the Tri-State area.  Lin Decl. ¶¶ 25, 28; Koblenz Ex. 5 at 25:22-26:15.  MCKC's retail store is located at 36-51 College Point Boulevard, Flushing, New York 11354.  Lin Decl. ¶ 28; Koblenz Ex. 5 at 26:8-11.  MCKC was and is MC's and MC l's direct competitor.  Lin Decl. ¶ 29; Koblenz Ex. 5 at 30:3-10; Koblenz Ex. 4 ¶ 23.

### c.  The United-States-Patent-And-Trademark-Office-Registered Trademarks

On July 23, 2017, Plaintiff Lin filed for a service trademark with the United States Patent and Trademark Office ("USPTO") for the "Miracle Curtains" trademark ("MC Mark") under registration number 5,563,639.  Lin Decl. ¶ 38; Lin Ex. B.  Defendants Guan, Weirong, MCNY, MW and MCKC did not file an opposition to Lin's application for the MC Mark.  See Koblenz Ex. 5 at 41:17-42:6; Pls.' Rule 56.1 Stmt. ¶ 39; Defs.' Rule 56.1 Counter Stmt. ¶ 39.  On September 18, 2018, the USPTO approved Lin's application for the MC Mark and issued him a Registration Certificate memorializing same.  Lin Decl. ¶ 40; Lin Ex. D.

On September 26, 2017, Lin filed for a service trademark with the USPTO for the "Chinese Character" trademark ("Chinese Character Mark"), which in English means "Housekeeper Curtains", under registration number 5,625,296.  Lin Decl. ¶ 39; Lin Ex. C.  Guan, Weirong, MCNY, MW and MCKC did not file an opposition to Lin's application for the Chinese Character Mark.  See Koblenz Ex. 5 at 41:17-42:6; Pls.' Rule 56.1 Stmt. ¶ 43; Defs.' Rule 56.1 Counter Stmt. ¶ 43.  On December 11, 2018, the USPTO approved Lin's application for a service trademark for the Chinese Character Mark and issued him a Registration Certificate memorializing same.  Lin Decl. ¶ 41; Lin Ex. E.

### d. The New-York-State-Registered Trademark

On December 11, 2017, Defendant MCNY filed an application with the New York State Department of State, Division of Corporations ("Division of Corporations") to register a mark including Chinese characters ("MCNY Mark") as a trademark in New York State.  Lin Decl. ¶ 48; Lin Ex. H; Koblenz Ex. 5 at 52:23-54:7.  The MCNY Mark application describes the trademark as: "A capital letter 'M' which left side is framed by a shape of curtains and right followed by four Chinese characters in simplified fonts with meaning of 'housekeeper curtain' arched and covered by ribbon on its first and second characters."  Lin Ex. H; Koblenz Ex. 5 at 62:11-20.  The "M" in the MCNY Mark stands for "Miracle" and the image next to the "M" are curtains.  Koblenz Ex. 5 at 68:6-17; see Lin Decl. ¶ 50.  Defendant Guan signed the MCNY Mark application on behalf of MCNY.  See Koblenz Ex. 5 at 54:8-11; Lin Ex. H.  By signing the MCNY Mark application under the penalties of perjury, Guan authorized and approved the MCNY Mark application in its entirety for filing with the Division of Corporations.  Koblenz Ex. 5 at 63:19-64:3; see Lin Decl. ¶ 48; Lin Ex. H.  Guan averred under the penalties of perjury that: "[t]he applicant is the owner of the mark, the mark is in use, and, to the knowledge of the person

verifying the application, no other person has registered, either federally or in this state, or has the right to use such mark either in the identical form or in such near resemblance as to be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or to deceive." See Lin Decl. ¶ 48; Lin Ex. H.  Guan did not personally search the USPTO database or otherwise conduct any due diligence to confirm if another party had federally registered any aspect of the MCNY Mark, or if another party had the legal right to use any aspect of the MCNY Mark for purposes of avoiding confusion, mistake or deception.  See Koblenz Ex. 5 at 60:14-18; Pls.' Rule 56.1 Stmt. ¶ 53; Defs.' Rule 56.1 Counter Stmt. ¶ 53.  Guan applied for the MCNY Mark to protect it from being copied.  Koblenz Ex. 5 at 54:12-19.  The Division of Corporations issued MCNY the MCNY Mark under Registration Number R33122.  See Lin Decl. ¶ 48; Lin Ex. H.  Lin federally filed for the Marks before MCNY filed for the MCNY Mark.  Koblenz Ex. 5 at 59:2-15; see Lin Exs. B-C, H.  MCNY uses the Marks in its commercial advertising online, at its retail store, on television, on company vehicles and on its business cards.  Lin Decl. ¶ 51; Lin Ex. I; Koblenz Ex. 5 at 49:21-52:22.

### e.   MCKC's Use Of "Miracle Curtains"

The MC Mark is completely subsumed in MCKC's name.  See Lin Decl. ¶ 52; Koblenz Ex. 5 at 47:16-48:12.

### f.   Cease-and-Desist Letters

On January 5, 2019, Lin's predecessor counsel (Feigin & Fridman, LLC) sent a letter to Guan stating that Lin was the owner of the Marks and requested that Defendants cease utilizing and misappropriating the Marks.  Lin Decl. ¶ 55; Lin Ex. J.  On September 5, 2019, Lin, through current counsel (Sahn Ward, PLLC) sent a letter to Guan stating that Lin was the owner of the Marks and requested Defendants to cease utilizing and misappropriating the Marks.  Lin Decl. ¶

56; Lin Ex. K.

### g. Trademark Trial And Appeals Board Proceeding

Guan and MC filed with the Trademark Trial and Appeals Board ("TTAB") of the USPTO a Petition to Cancel both of the Marks on October 28, 2021. Opp. at 3 n.1; Li Ex. 36. On November 12, 2021, Plaintiffs filed a notice pursuant to Trademark Rule 2.106(b)(3)(i) advising the TTAB of the instant action and requested that TTAB suspend the cancellation proceeding until this Court can fully adjudicate this action. Reply at 6 n.5; Koblenz Ex. 9. On January 5, 2022, the TTAB suspended the cancellation proceeding until a final determination is reached in this civil action. See Miracle Curtains Inc. et al. v. Lin, Cancellation No. 92078343, 10 TTABVUE (T.T.A.B. Jan. 5, 2022).

### ii. Disputed Facts

Defendants challenge that Plaintiff Lin has the exclusive right to use the Marks in commerce, arguing that Lin is not the owner of the Marks and that Lin did not first use the marks in commerce. See Opp. at 4-11; Guan Decl. ¶ 155(b). In response, Plaintiffs argue that Lin, as the sole owner of MC, was the first user of the Marks and had the right to use and register the Marks based on his role at MC that put him in control of the quality of the products containing the Marks. See Reply at 3-6; Lin Decl. II ¶¶ 18-19. Defendants dispute that Lin was the sole owner of MC, and assert that Defendant Guan was a 50% shareholder with Lin; Defendants also dispute the nature of Lin's role at MC, arguing that Guan had control over the quality of MC's products. See Opp. at 4-11; Guan Decl. ¶¶ 65, 155(a).

### a. Ownership And First Use Of The Marks

Defendants argue it is MC, and not Lin himself, that first used its corporation name "Miracle Curtains, Inc." and the Chinese Character Mark in commerce to identify its curtain

8

products.  Guan Decl. ¶¶ 32-45, 84-89; Guan Ex. 4; Weirong Decl. ¶¶ 8-17; Weirong Exs. 1-4; see Li Ex. 4.  Defendants contend that Guan was an equal shareholder of MC.  Guan Decl. ¶¶ 46-55; Guan Exs. 1-2.  As MC first used the Marks in commerce, Defendants argue that Guan has rights to use the Marks that were equal to Lin's rights to use the marks.  See Opp. at 10-11.  Moreover, Guan asserts that he conceived of and created both the English and Chinese names for MC, which form the basis of the Marks.  Id. at 2; Guan Decl. ¶¶ 38-45, 71-83.

In support of Defendants' contentions, Defendants submit the following evidence: a declaration from Guan, Guan Decl.; the Composite Certificate for MC that identifies Lin and Guan as the "shareholders" of MC and "shares of interest owned" for each is "50% of shares," Guan Decl. ¶¶ 47-48; Guan Ex. 1; the MC store lease that names Lin and Guan as each owning "50%" of the stock in MC, Guan Decl. ¶¶ 49-55; Guan Ex. 2; and state court filings with statements from Lin asserting that Guan was a 50% shareholder in MC, Guan Decl. ¶¶ 56-59; Li Exs. 10-11.

Guan states that in early 2013, his sister Guang, who is also Lin's wife, asked Guan to help her get back to working.[4]  Guan Decl. ¶ 36.  Guan helped his sister start a curtain business.  See id. ¶¶ 38-39.  Guang first worked with Guan at his store, G & Q Home Fashion, Inc. ("G&Q Fashion"), for two months in order to train and to learn about his curtain business.  Id. ¶¶ 38-40.  After her training period, Guan agreed to open a store with Guang in Flushing, Queens.  Id. ¶¶ 41-42.  When the incorporation papers were ready to be signed, Guang asked her husband, Lin, to sign the paperwork instead because she had been in a recent car accident.  Id. ¶¶ 43-45.

Guan states that he and his wife, Weirong, conceived of the name "Miracle Curtains" for the new business, as they are both Christians and chose this name based on their belief in the

---

[4] Guang is not a party to this action.

9

miracles that God performs.  Id. ¶¶ 71-73.  Guan also contends that he developed the Chinese name for the business, stating it is common for Chinese-American businesses to also have a Chinese name that need not correspond exactly to the business's English name.  Id. ¶¶ 74-81. Guan states he developed the name by using the Chinese phrases "guan jia" which translates to both "Guan's family" and "housekeeper," and "chuang lian" which translates to "curtain."  Id. ¶¶ 76-80.  Around August 2013, Guan suggested to Weirong that they use the Chinese name "guan jia chuang lian" for MC, and Weirong liked the idea.  Id. ¶¶ 81-82.  After Guan and Weirong decided on the Chinese name, Guan told his sister, Guang, and he believed that she was also happy with the name.  Id. ¶ 83.

After deciding on the Chinese name for MC, Weirong commissioned Sanford Printing Inc. to create the design for the Chinese name logo, and Guan commissioned Miles Glass & Metal Sign Corp. ("Miles") to make a sign for the storefront in Flushing that contained both the English and Chinese names for the store.  Id. ¶¶ 84-86.  By the end of 2013, there also existed business cards for MC and Guan that displayed both the English and Chinese names for MC.  Id. ¶¶ 87-88; Guan Ex. 4.  In early 2014, Weirong began advertising MC's business and its Chinese name by publishing an advertisement in the World Journal.  Guan Decl. ¶¶ 97-99; Weirong Decl. ¶¶ 8-13; Weirong Exs. 1-2.  In 2015 and 2016, Weirong placed additional advertisements for MC using the MC name and its Chinese name in Sinovision.  Guan Decl. ¶ 100; Weirong Decl. ¶¶ 15-17; Weirong Ex. 4.  Lin and his wife (Guang) and Guan and his wife (Weirong) equally shared the costs for the advertisements in World Journal and Sinovision.  Guan Decl. ¶ 101.  The advertisements for MC in World Journal and Sinovision also advertised for G&Q Fashion under the same Chinese business name.  Id. ¶ 99; see Weirong Exs. 2, 4.

Guan testifies that he and Weirong always believed that they owned the Chinese business

name because he created it, and it carries his family's name.  Guan Decl. ¶ 105.  Guan also states

that Lin never used "Miracle Curtains" or the Chinese business name at any time or place

separately from MC's use of these names.  Id. ¶ 106.  Guan avers that at no time during their

partnership did Lin ever proclaim that he owned the English name "Miracle Curtains" or the

Chinese business name.  Id. ¶ 107.

Lin testifies that he is the President and sole shareholder of MC and MC 1.  Lin Decl. ¶¶

2, 4.  Lin states that he facilitated the formation of MC as a New York domestic business

corporation, and not a partnership.  Lin Decl. II ¶ 4.  Lin claims that he was the one who

contacted Miles to create the design for the storefront sign that was installed in 2013, not Guan.

Id. ¶ 11.

### b.  Lin's Role At MC

At the time MC was incorporated in 2013, Guan states Lin was mainly involved in selling

gifts, souvenirs and stone materials.  Guan Decl. ¶¶ 32-33, 60.  Guan asked Lin to help with the

start-up of MC mostly by delivering finished products to customers and helping with

installations in customers' homes.  Id. ¶ 61.  Guan describes this as Lin's role at MC through

2013, until 2014, when Guan believes Lin realized the curtain business was profitable, and chose

to begin to work full-time at MC.  Id. ¶¶ 63-64.  Guan avers that between 2014 through 2016,

Lin was responsible for measuring customers' orders and installing curtains on-site at customers'

homes and offices, while Guan was responsible for contacting suppliers of MC's products,

developing and creating new products, and supervising and controlling the quality of MC's

products.  Id. ¶ 65.

Lin claims that at the time of MC's creation, he was the sole employee, shareholder and

officer of MC.  Lin Decl. ¶ 8.  Lin avers that he hired Guan to work as an employee at MC, and

at Guan's request, Lin then hired Guan's wife, Weirong, to work there, too.  Id. ¶¶ 16, 19.  Lin

states that he taught Guan and Weirong the contours of MC's business, including the curtain business.  Id. ¶ 22.  Lin claims that he was responsible for the nature and quality of MC's goods and services that bore or were associated with the Marks.  Lin Decl. II ¶ 7.  Lin states that he was responsible for conducting site inspections with MC's customers, contacting and acquiring all necessary materials from MC's vendors, creating estimates or invoices for MC's customers, installing curtains for MC's customers, and servicing the curtain products for any MC customers, as needed.  Id. ¶ 13.[5]  Lin further claims that Guan only worked in MC's sales department and had no control over MC's day-to-day business operations, and that Guan never had the job duties of being responsible for contacting MC's suppliers, developing and creating new products, and supervising and controlling the quality of MC's products.  Id. ¶¶ 17-19.

### c.  Use Of The Chinese Character Name In Guan's Other Stores

Guan asserts that MC was never the exclusive user of the Chinese name for the store.  He avers that beginning in 2014, he used "guan jia chuang lian" as the Chinese name for other stores that he ran such as Bowery Fashion and G&Q Fashion.  Guan Decl. ¶¶ 90-96; Guan Ex. 5; Weirong Ex. 3; Li Exs. 15-20, 31.  Guan asserts that Lin and his wife (Guang), who is also Guan's sister, knew Guan used the Chinese name for his other businesses, as Guan's sister visited his other stores and worked at G&Q Fashion for two months in 2013.  Guan Decl. ¶¶ 102-03.  Lin and Guan's sister also paid for half of the advertisement costs in World Journal and Sinovision, which simultaneously advertised for G&Q Fashion under the same Chinese business name.  Id. ¶¶ 99, 104.

---

[5] Lin also asserts he performed the same roles and had the same responsibility for the nature and quality of the products associated with the Marks at MC 1.  Lin Decl. II ¶¶ 14-15.

### d.  Lin's Allegedly Fraudulent Registration Of The Marks

Lin declared in the respective applications to register the Marks that:

> To the best of the signatory's knowledge and belief, no other persons, except, if
> applicable, concurrent users, have the right to use the mark in commerce, either in
> the identical form or in such near resemblance as to be likely, when used on or in
> connection with the goods/services of such other persons, to cause confusion or
> mistake, or to deceive.

Li Exs. 21, 24.  Defendants contend that this assertion was fraudulent because Lin applied for the

registrations individually, not on behalf of MC, and as MC was the previous user of the Marks,

another user existed.  See Opp. 10-11.  Guan argues that he has just as much of a right to use the

Marks as Lin, as Guan argues he owned 50% of MC with Lin.  See id.  Defendants also contend

that G&Q Fashion has always been a concurrent user of the Chinese Character Mark with MC.

Guan Decl. ¶¶ 90-101; Guan Ex. 5; Weirong Exs. 1-4; Li Exs. 15-20, 31.

Lin disputes that his registration of the Marks was fraudulent.  Reply at 3-6.  Lin

acknowledges that G&Q Fashion was a concurrent user of the Chinese Character Mark, but

states that MC first used it in commerce.  Id. at 4.

### e.  Fabric From Luo Lan Shi Jia

Lin alleges that on or about June 2016, Guan and/or Weirong, acting in their capacity as

MC's employees, misappropriated MC's monies to purchase fabrics from Luo Lan Shi Jia, a

wholesale fabric distributor from China, for $30,000.00.  Lin Decl. ¶ 72; Koblenz Ex. 5 at 71:14-

72:24.  The parties agree that Guan caused the fabric to be shipped to a warehouse located at 15-

58 127th Street, College Point, New York 11356 ("Warehouse") that is leased to MW.  Lin Decl.

¶ 73; Koblenz Ex. 5 at 73:13-25; Pls.' Rule 56.1 Stmt. ¶ 69; Defs.' Rule 56.1 Counter Stmt. ¶ 69.

Lin claims he never authorized that the fabrics be sent to the Warehouse as MW is not affiliated

with Lin or MC.  Lin Decl. ¶ 74.  Lin requested that Guan immediately release the fabrics to Lin

and MC, as the fabrics were to fulfill an MC customer's order.  Id. ¶ 75.  Lin avers that Guan has

13

and continues to refuse to release the fabric to Lin and MC and/or compensate and/or reimburse Lin and MC for the purchase, and that this action resulted in an MC customer's order going unfulfilled.  Id. ¶ 76.

Guan states that it is false that he refused to release fabrics allegedly owed to Lin because Weirong ordered and paid for the fabrics from Luo Lan Shi Jia on behalf of G&Q Fashion, not MC.  Guan Decl. ¶ 156(j).

### f.   Elwin, Inc.

The following facts are not disputed by the parties:  Elwin, Inc. ("Elwin") is a California domestic business corporation that manufactures window shades.  Lin Decl. ¶ 79.  Since 2013, MC has purchased window shades, blinds, and other accessory items from Elwin, which MC then sold to its customers.  Id. ¶ 80; Koblenz Ex. 5 at 76:3-5.  MC had a prosperous business relationship with Elwin.  See Pls.' Rule 56.1 Stmt. ¶ 75; Defs.' Rule 56.1 Counter Stmt. ¶ 75.

Lin contends that he planned to continue his business relationship with Elwin once Lin opened MC 1.  Lin Decl. ¶ 81.  Lin states that on or about March 22, 2017, Lin ordered certain window shades/blinds from Elwin on behalf of MC.  Id. ¶ 82.  Lin claims that prior to March 22, 2017, Guan and/or Weirong contacted a representative at Elwin, John Kang, and notified him that they were the owners of MC and as such, Elwin should not transact business with MC via Lin.  Id. ¶ 83.  Lin states that on March 23, 2017, Mr. Kang notified Lin of what Guan and Weirong had informed him, and although Mr. Kang agreed to honor Lin's current order, Elwin would no longer accept any prospective orders from MC until the "internal conflict" was resolved between Lin and Guan.  Id. ¶ 85; Lin Ex. L.  Lin avers that neither Lin nor MC 1 can transact business with Elwin due to Guan and/or Weirong's actions and/or omissions.  Lin Decl. ¶ 86.

Guan states that it is false that he or Weirong ever notified Mr. Kang that Elwin should

14

not transact anymore business with MC.  Guan Decl. ¶ 156(k).  Guan states that Mr. Kang was aware that Guan was the owner of MC, that Guan and Lin's partnership ended around March 2017 because Lin allegedly stole the main computer from MC's office, and that Lin's wife made a false report against Weirong to the police.  Id.

### g.  Lease Agreement

The following facts are not in dispute: On or about August 14, 2013, Lin, on behalf of MC, executed a document titled "Lease for Premises at 36-51 College Point Boulevard, Flushing, New York 11354" ("Lease Agreement") with 99 College Point LLC ("Landlord") to permit MC to occupy and conduct business out of its retail location.  Lin Decl. ¶ 7; Koblenz Ex. 4 ¶ 2.  Lin and Guan agreed to split the rent due under the Lease Agreement.  Lin Decl. ¶ 91; see Pls.' Rule 56.1 Stmt. ¶ 84; Defs.' Rule 56.1 Counter Stmt. ¶ 84.  From August 2013 through around March 2017, Guan and Lin paid their respective 50% portions of the rent due under the Lease Agreement.  Lin Decl. ¶ 92; see Pls.' Rule 56.1 Stmt. ¶ 85; Defs.' Rule 56.1 Counter Stmt. ¶ 85.

Lin claims that the Landlord advised Lin that as a precedent condition to it executing the Lease Agreement, Lin was required to execute a Good Guy Guaranty and establish certain financial requirements.  Lin Decl. ¶ 88.  Lin claims he therefore asked Guan, as his brother-in-law and an employee of MC, if Guan would agree to sign the Good Guy Guaranty.  Id. ¶ 89.  Lin claims that due to their familial relationship, and Guan's interest in making MC profitable, Guan agreed to execute the Good Guy Guaranty.  Id. ¶ 90.  Lin claims that around March 2017, Guan refused to pay his 50% share of the rent due.  Id. ¶ 93.  Lin alleges that, in order to ensure that MC did not breach the Lease Agreement or was not evicted, Lin paid Guan's portion of the rent and taxes, totaling approximately $55,786.00.  Id. ¶ 94.  Lin avers that despite his repeated requests to Guan for the monies, Guan refused to remit payment to Lin.  Id. ¶ 95.

15

Guan claims that, after Lin found the location for the new store on College Point Boulevard, Guan agreed to renting that location and personally contacted the broker and management company to secure the lease.  Guan Decl. ¶ 50.  Guan states he also secured an attorney to negotiate the terms of the lease for him and Lin.  Id.  Guan states that he and Lin both signed the Lease Agreement with a Good Guy Guaranty together at the attorney's office.  Id. ¶ 51.  Guan states that he was also the one who paid the brokerage fee to secure the Lease Agreement.  Id. ¶ 55; Guan Ex. 3.  Guan states he did not sign the Good Guy Guaranty to MC as an employee of MC or because he is Lin's brother-in-law; he states he signed it as a shareholder, as listed on the Lease Agreement, and because he was required by the Landlord to be a guarantor on the lease.  Guan Decl. ¶ 155(f).  Guan also claims it is false that Lin paid approximately $55,786.00 in rent to cover rent that Guan did not pay.  Id. ¶ 156(l).  Guan states that it is Lin who was delinquent on rent payments, and that Lin stopped paying his 50% share of the rent since July 2017 and has not paid rent since then.  Id.

### h.  Guan And Lin's Partnership Breakdown

Guan states that at MC, Weirong and Lin's wife, Guang, who is also Guan's sister, developed very different management styles.  Guan Decl. ¶ 108.  He states that Weirong was focused on product quality and customer satisfaction, while Guang was focused on controlling the customers and generating profits.  Id.  Guan took his wife, Weirong's, side in this dispute, and as a result, gradually kept his distance from his sister, Guang, and began to have an estranged relationship with her and her husband Lin.  Id. ¶¶ 109-10.  Guan states that the disagreements between his sister and Weirong escalated in 2016.  Id. ¶ 111.

Guan claims that in the summer of 2016, his sister called the police to MC and falsely reported that Weirong had stolen products from MC's warehouse.  Id. ¶ 112.  Guan states the police warned his sister that it was unlawful to falsely report a crime.  Id.  Guan claims that, at

the same time, Lin began to spread false statements in Chinese business associations that were intended to damage Guan's reputation.  Id. ¶ 114.  Guan states that after these incidents, he decided not to let Lin use any of his inventory to fulfill orders for Lin's customers.  Id. ¶ 116. Guan avers that, since the start of MC, he, Weirong, Lin and Guang always developed and maintained separate customers in MC's bank account and were paid the net profits from their respective customers separately.  Id. ¶ 67.

Guan alleges that in March 2017, Lin removed and possessed the main computer from MC's office that contained all of the customers' information, supplier information, and order histories and status.  Id. ¶¶ 118-19; Guan Ex. 6.  Guan claims that in March 2017, he and Weirong formed MCNY because they were concerned that Lin and his wife's destructive behavior would disrupt service of open orders to Guan and Weirong's customers.  Guan Decl. ¶ 117.  In October 2017, Guan claims that Lin and his wife removed all of their personal belongings from MC's store, and on the way out, Lin damaged Guan's personal computer as well as took inventory from storage valued at a minimum of $50,000.00.  Id. ¶ 120; Guan Ex. 7. Guan claims that since October 2017, neither Lin nor his wife have been to the MC store.  Guan Decl. ¶ 122.  As described above, Lin and his wife opened MC 1 in July 2017.  Id. ¶ 123.  Guan states that, as a result of Lin failing to pay his share of the rent per the Lease Agreement, Guan opened MCKC in July 2018, to pay for Lin's unpaid share of the rent due.  Id. ¶¶ 137-41.

### c.  The Motion For Summary Judgment

Plaintiffs move for summary judgment, arguing that there is no dispute of material fact that Defendants intentionally and maliciously infringed upon, misappropriated and diluted Lin's federally registered trademarks for the MC Mark and the Chinese Character Mark in violation of (1) Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) Section 43(a) of the Lanham Act, 15

17

U.S.C. § 1125(a); (3) New York General Business Law § 349; (4) New York General Business Law § 360-L; and (5) New York common law. See Memo. at 1. Plaintiffs argue there is no genuine dispute of material fact that Defendants have and continue to unfairly compete with Plaintiffs, are being unjustly enriched at Plaintiffs' expense, and have tortiously interfered with Plaintiffs' prospective economic advantage. See id. Plaintiffs also argue that Defendants Guan and Weirong, while employed by MC, breached their fiduciary duties to Lin and MC by opening and operating competing businesses, MCNY and MW, prior to ceasing their employment relationship with Lin and MC. See id. Plaintiffs ask the Court to grant their motion for summary judgment on all causes of action asserted in the Amended Complaint, find that Defendants' actions and/or omissions were willful, and issue a permanent injunction barring Defendants from utilizing and misappropriating the Marks in any capacity. See id. at 1-2.

Defendants argue that this Court should deny Plaintiffs' motion for summary judgment on their trademark infringement claims because documentary evidence establishes that Lin is not the owner of the MC Mark or Chinese Character Mark, and Lin did not first use either mark in commerce to identify curtain products or services. See Opp. at 6. Defendants also argue that the Court should deny Plaintiffs' motion for summary judgment on the Second, Third, Fourth and Fifth Causes of Action in the Amended Complaint because liability depends on whether Lin was the owner of the Marks, which Defendants argue he is not. See id. at 12-14. Defendants also argue that summary judgment should be denied on Plaintiffs' Fifth Cause of Action because Plaintiffs have failed to submit any evidence of Guan's bad faith. See id. at 14. Defendants argue that summary judgment should be denied on Plaintiffs' Sixth, Seventh and Eighth Causes of Action because disputes of material fact exist. See id. at 14-16. Defendants further argue that this Court should sua sponte dismiss Plaintiffs' trademark action and related claims under New

18

York statutory and common law, despite the absence of a formal notice of cross-motion for summary judgment, based on Defendants' argument that it is undisputed Lin is not the owner of the MC Mark or the Chinese Character Mark.  See id. at 16-19.

## II.   LEGAL STANDARD

### a.   Summary Judgment

On a motion for summary judgment, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sloley v. VanBramer, 945 F.3d 30, 36 (2d Cir. 2019) (citing Burg v. Gosselin, 591 F.3d 95, 97 (2d Cir. 2010)) (alterations omitted).  Summary judgment is appropriate only if the pleadings, the discovery materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The movant bears the burden of satisfying the summary judgment standard.  See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005).

### b.   Federal Claims Under The Lanham Act And New York Common Law Trademark Infringement

Section 32 of the Lanham Act prohibits the unauthorized use of a federally-registered trademark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a).  Section 43(a) of the Lanham Act prohibits "[a]ny person" from using "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods."  15 U.S.C. § 1125(a)(1)(A).   Claims for trademark infringement, false designation of origin and unfair competition under the Lanham Act "require that [the p]laintiff first demonstrate that it owns a valid trademark."  See Int'l Labels LLC v. Sportlife Brands LLC, No.

19 Civ. 11370 (AJN), 2021 WL 1198890, at *3 (S.D.N.Y. Mar. 30, 2021) (citations omitted).

Mark ownership is required for a trademark-infringement claim asserted pursuant to Section

43(a), even though not every other type of unfair-trade-practice claim that may be asserted

pursuant to Section 43(a) requires ownership.  See Empresa Cubana del Tabaco v. Culbro Corp.,

399 F.3d 462, 478-79 (2d Cir. 2005).

Trademark-infringement claims are analyzed under a two-prong test: (1) whether the

plaintiff's mark merits protection, and (2) whether the use of a similar mark is likely to cause

confusion.  See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 823 F.3d

153, 160 (2d Cir. 2016).  "The same facts that establish the [defendants] violated section 32 of

the Lanham Act establish[] that they violated section 43(a)."  Microsoft Corp. v. AGA Sols.,

Inc., 589 F. Supp. 2d 195, 203 (E.D.N.Y. 2008) (citation omitted).  "[T]he elements of a cause of

action for New York common law [trademark] infringement . . . mirror the requirements of

claims stated under the Lanham Act and similarly require that a party demonstrate a valid,

protectable mark and a likelihood of confusion between the marks of the alleged infringer and

the charging party."  Ritani, LLC v. Aghjayan, 880 F. Supp. 2d 425, 448 (S.D.N.Y. 2012)

(citation omitted).

A "plaintiff must [first] demonstrate its own right to use the mark or dress in question."

ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 154 (2d Cir. 2007) (collecting cases).  A plaintiff must

show a priority of right to the challenged marks over the defendants in order to be entitled to

relief.  See P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc., 462 F.2d 134, 136 (2d Cir. 1972).

"A certificate of registration with the PTO is prima facie evidence that the mark is registered and

valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive

right to use the mark in commerce."  Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc., 192 F.3d

20

337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a)).  "As a result, when a plaintiff sues for

infringement of its registered mark, the defendant bears the burden to rebut the presumption of

[the] mark's protectibility by a preponderance of the evidence." Id. (citation omitted).

Generally, "trademark ownership rights go to the 'first-to-use, not [the] first-to-register.'"

Haggar Int'l Corp. v. United Co. for Food Indus. Corp., 906 F. Supp. 2d 96, 105 (E.D.N.Y.

2012) (quoting 2 McCarthy on Trademarks & Unfair Competition § 16:18 (4th ed. 2010)); see

Threeline Imports, Inc. v. Vernikov, 239 F. Supp. 3d 542, 557-58 (E.D.N.Y. 2017) ("It is well

established that the standard test of ownership is priority of use." (quotation marks & citations

omitted)).  "The user who first appropriates the mark obtains [an] enforceable right to exclude

others from using it, as long as the initial appropriation and use are accompanied by an intention

to continue [using] the mark commercially." See La Societe Anonyme des Parfums le Galion v.

Jean Patou, Inc., 495 F.2d 1265, 1271 (2d Cir. 1974) (citations omitted).

        In order to establish "use in commerce" sufficient to overcome the presumption of

validity created by a plaintiff's registration of the trademark, however, the defendants must show

that they were using the mark in commerce before the plaintiff and that such use was made "in a

way sufficiently public to identify or distinguish the marked goods in an appropriate segment of

the public mind as those of the adopter of the mark.'" Windows User, Inc. v. Reed Bus. Pub.

Ltd., 795 F. Supp. 103, 108 (S.D.N.Y. 1992) (quotation marks & citations omitted).  "To prove

bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has

been deliberate and continuous, not sporadic, casual or transitory." La Societe Anonyme des

Parfums le Galion, 495 F.2d at 1271-72 (citation omitted).  A court must determine whether a

trademark has been used in commerce "on a case by case basis, considering the totality of the

circumstances" around the use of the mark. Chere Amie, Inc. v. Windstar Apparel, Corp., No.

01 Civ. 40 (WHP), 2002 WL 460065, at *4 (S.D.N.Y. Mar. 26, 2002).

As relevant in this case, the Lanham Act provides a number of defenses to charges of infringement of an incontestable trademark, including: "(1) [t]hat the registration or the incontestable right to use the mark was obtained fraudulently; . . . (5)" that the alleged infringers were rightful continuous prior users of the mark, or ". . . (9) [t]hat equitable principles, including laches, estoppel, and acquiescence, are applicable." See 15 U.S.C. § 1115(b).  While a mark gains "incontestable" status after it "has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce . . . ," such status is not afforded to marks where a "proceeding involving said rights [is] pending in the United States Patent and Trademark Office or in a court and not finally disposed of."  15 U.S.C. § 1065.

### c.  Related-Companies Doctrine

"The related companies doctrine permits trademark ownership by a licensor who exercises substantial control over the mark's use by a licensee, based upon use by the licensee." Carpenteri v. Marini, No. 05 Civ. 766 (JCH), 2006 WL 2349586, at *5 (D. Conn. July 11, 2006).

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.  If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055; see Secular Orgs. for Sobriety, Inc. v. Ullrich, 213 F.3d 1125, 1130 (9th Cir. 2000) ("In order for SOS Inc. to prevail on its trademark claim, it must demonstrate that it was the first user of the disputed marks or, in the alternative, that if SOS–West was using the marks first, it was doing so as a related entity and the benefits of any such use should therefore inure to SOS Inc."); 3 McCarthy on Trademarks & Unfair Competition § 18:46 (5th ed. 2022)

("Ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee.").

The Lanham Act defines "related company" as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. Formal corporate control (i.e., stockholders, corporate officers, etc.) of the related company is not required as the primary focus is whether the registrant controlled the nature and quality of the goods and services bearing the trademarks. See Estate of Coll-Monge v. Inner Peace Movement, 524 F.3d 1341, 1348 (D.C. Cir. 2008); Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J., 894 F. Supp. 2d 288, 310 (S.D.N.Y. 2012).

### d.   Violation Of New York General Business Law § 349

N.Y. Gen. Bus. Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). To succeed on such a claim, a plaintiff must show "that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 967 N.E.2d 675 (N.Y. 2012)).

### e.   Trademark Dilution Under New York General Business Law § 360-L

To establish a trademark-dilution claim under N.Y. Gen. Bus. Law § 360-L, the moving party must demonstrate that "(1) the trademark is truly of distinctive quality; and (2) there is a likelihood of dilution." See Sly Magazine, LLC v. Weider Publ'ns L.L.C., 346 F. App'x 721,

723 (2d Cir. 2009) (quotation marks & citation omitted).  The movant's mark does not have to be famous to be protected but must be "substantially similar" to the infringing mark.  See E.A. Sweep Co. v. A&M Deli Express, Inc., 787 F. App'x 780, 786 (2d Cir. 2019).  "Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes."  Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1030 (2d Cir. 1989) (citations omitted).  Dilution is the "blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey."  Id. at 1031 (citation omitted).  "[T]o establish a trademark dilution claim under [N.Y. Gen. Bus. Law § 360-L], [a plaintiff] must show ownership of a distinctive mark . . . ."  Empresa Cubana del Tabaco, 399 F.3d at 485-86 (quotation marks & citation omitted).

### f.  New York Common Law Unfair Competition

"The state law cause of action for unfair competition shares many common elements with the Lanham Act claims of false designation of origin and trademark infringement."  W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 576 (2d Cir. 1993).  "The essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'"  Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34 (2d Cir. 1995) (quoting Rosenfeld v. W.B. Saunders, 728 F. Supp. 236, 249-50 (S.D.N.Y. 1990)) (alterations omitted).  Where an unfair-competition claim is premised solely on allegations of trademark infringement, liability depends on the plaintiff establishing ownership of the marks at issue.  See Carpenteri, 2006 WL 2349586, at *4.

### g.  Unjust Enrichment

Under New York law, a claim for unjust enrichment exists when "(1) the other party was

24

enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to

permit the other party to retain what is sought to be recovered." Georgia v. Malone & Co., Inc.

v. Rieder, 973 N.E.2d 743, 746 (N.Y. 2012) (quotation marks & citation omitted).  In other

words, "[c]entral to a claim for unjust enrichment is an allegation that a 'benefit was bestowed . .

. by plaintiffs and that defendants will obtain such benefit without adequately compensating

plaintiff[s].'" CodeFab, LLC v. WG, Ltd., Index No. 108861/08, 2017 WL 2181079, at *12

(Sup. Ct. N.Y. Cnty. May 18, 2017) (quoting Weiner v. Lazard Freres & Co., 672 N.Y.S.2d 8, 12

(1st Dep't 1998)).

### h.  Tortious Interference With Prospective Economic Advantage

Under New York law, to recover on a cause of action alleging tortious interference with

prospective economic advantage, a plaintiff must demonstrate that: "(a) the plaintiff had business

relations with a third party; (b) the defendant interfered with those business relations; (c) the

defendant acted with the sole purpose of harming the plaintiff or by using unlawful means; and

(d) there was resulting injury to the business relationship." N. State Autobahn, Inc. v

Progressive Ins. Grp. Co., 953 N.Y.S.2d 96, 108 (2d Dep't 2012) (quotation marks & citation

omitted).

### i.  Breach Of Fiduciary Duties

"The faithless servant doctrine prohibits an employee from acting in any manner

inconsistent with his agency or trust and requires him, at all times, to exercise the utmost good

faith and loyalty in the performance of his duties." Motherway v. Retail Unlimited Maintenance

or Remodel, Inc., Index No. 34757/09, 2014 WL 5365319, at *4 (N.Y. Sup. Ct. Suffolk Cnty.

Oct. 2, 2014) (citing Mar. Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 474 N.Y.S.2d 281,

285 (1st Dep't 1984)).  "When an employee engaged in a business that, by its nature, competes

with the employer's business, a double breach of duty occurs." Id. (citing Mar. Fish Prods., 474 N.Y.S.2d at 285). "Not only is the principal deprived of the services for which he has contracted, but he finds these services turned against himself." Robert Reis & Co. v. Volck, 136 N.Y.S. 367, 369 (1st Dep't 1912). In Maritime Fish Products, Inc. v. World-Wide Fish Products, Inc., the First Department held that an employee who "surreptitiously organized a competing corporation, corrupted a fellow employee, and secretly pursued and profited from one or more opportunities properly belonging to his employer" is evidence of violating the faithless servant doctrine. See Mar. Fish Prods., 474 N.Y.S.2d at 285.

## III.   DISCUSSION

### a.   No Party Is Entitled To Summary Judgment On The Lanham-Act And New-York-Common-Law-Trademark-Infringement Claims

The Court cannot grant summary judgment for Plaintiffs, nor can it sua sponte dismiss Plaintiffs' action as Defendants suggest, because disputes of material fact exist as to the first prong of the two-prong-trademark-infringement test: whether the Marks merit protection. As explained supra, Section I.b.ii.a, the parties dispute who owns the Marks. This dispute is entangled with the dispute regarding the corporate structure of MC, and Guan and Lin's respective roles at MC. See supra Sections I.b.ii.a-b. As outlined above, Lin claims that he owns the Marks through the related-companies doctrine because he solely controlled the quality and nature of the goods at MC and the trademarks were first used by MC. Guan disputes that Lin is the sole shareholder of MC and that Lin had exclusive control over the quality and nature of the goods at MC, and alleges that Guan is the person who controlled the quality and nature of the goods at MC. Guan also alleges that he conceived of the MC Mark and the Chinese Character Mark, the latter of which Guan alleges is based on his family name. Guan argues that Lin fraudulently registered the Marks, and as such a cancellation proceeding is pending with the

26

TTAB, although it has been stayed during the pendency of this lawsuit.  The parties present competing evidence regarding the ownership of MC and whether it was Guan or Lin or both who had control over the quality and nature of the goods sold at MC, which bore the Marks.

There also "exists an issue of material fact as to whether [Lin] could earnestly believe his attestation that 'no other person, firm, corporation, or association ha[d] the right to use [the Marks]'" given that Guan claims that he and Weirong conceived of the Marks for use by MC, which Lin does not dispute, but Lin registered the Marks in his individual capacity.  See Privado Mktg. Grp. LLC v. Eleftheria Rest Corp., No. 13 Civ. 3137 (ER), 2017 WL 1167332, at *9 (S.D.N.Y. Mar. 27, 2017) (denying the plaintiffs' motion for summary judgment on trademark infringement action); Guan Decl. ¶¶ 71-83; Lin Decl. ¶¶ 38-39; Lin Exs. B-C.

As there exists disputes of material fact regarding whether Lin has valid or exclusive ownership of the Marks, this Court cannot decide as a matter of law any of the federal or common-law-trademark claims.  See Tommy's Supplies LLC v. Papillon Ink LLC, No. 16 Civ. 1922 (RAR), 2020 WL 1532367, at *5-7 (D. Conn. Mar. 31, 2020) (denying cross motions for summary judgment on trademark claims because dispute of material fact existed as to validity of the trademark); TufAmerica, Inc. v. Codigo Music LLC, 162 F. Supp. 3d 295, 331 (S.D.N.Y. 2016) (finding federal and common-law-infringement claims not amenable to resolution on summary judgment because disputed issues of fact remain as to whether the complainant actually owns a valid and protectable trademark).  Plaintiffs' motion for summary judgment on the Lanham-Act and New-York-common-law-trademark-infringement claims is therefore denied. The Court declines to sua sponte grant summary judgment in Defendants' favor for the same reasons.

**b.   No Party Is Entitled To Summary Judgment On Claims Under New York General Business Law §§ 349, 360-L; New York Common Law Unfair Competition**

Plaintiffs' claims under N.Y. Gen. Bus. Law §§ 349 and 360-L, and Plaintiffs' claim under New York common law unfair competition are based on the same allegations of Defendants' trademark infringement.  As outlined above, there are disputed issues of material fact as to the ownership of the Marks.  For the reasons stated supra, Section III.a., this Court denies Plaintiffs' motion for summary judgment and declines to sua sponte grant summary judgment in favor of Defendants on these claims.

**c.   No Party Is Entitled To Summary Judgment On The Unjust-Enrichment Claim**

Plaintiffs' unjust-enrichment claim is based on two theories: 1) that Guan and Weirong stole fabric ordered by MC for an MC customer and refused to return it or compensate Lin; and 2) that Guan owes Lin unpaid rent.  See supra Sections I.b.ii.e, g; Memo. at 22-23.  Defendants assert that the fabric was ordered on behalf of G&Q Fashion, and therefore, as it did not belong to MC, Defendants could not have stolen it from Lin.  See supra Section I.b.ii.e.  Defendants also offer competing evidence to Plaintiffs' evidence as to the circumstances around Guan's signing of the Lease Agreement, including that Lin owes unpaid rent to Guan, not vice versa.  See supra Section I.b.ii.g.  There are, thus, disputes of material fact such that the Court cannot decide this claim as a matter of law.  This Court denies Plaintiffs' motion for summary judgment and declines to sua sponte grant summary judgment in favor of Defendants on this claim.

**d.   No Party Is Entitled To Summary Judgment On The Tortious-Interference-With-Prospective-Economic-Advantage Claim**

Plaintiffs claim that Defendants Guan and Weirong contacted Mr. Kang, Elwin's representative, and told him that they were the owners of MC and that Elwin should no longer transact business with MC.  See supra Section I.b.ii.f.  Plaintiffs claim that around March 23,

2017, Mr. Kang notified Lin that, while he would fill the current order for Lin, Elwin would not accept prospective orders from Lin until the "internal conflict" between Lin and Guan was resolved.  Id.  Plaintiffs therefore claim that their business relationship with Elwin was damaged because of Guan's and Weirong's actions.  Memo. at 23-24.  Defendants, on the other hand, deny that Guan ever told Mr. Kang to stop doing business with MC.  See supra Section I.b.ii.f. Defendants state that Mr. Kang was aware of conflicts between Lin and Guan and Weirong.  Id. Defendants argue that, even if they had made such a statement to Elwin to stop doing business with MC, it would not constitute an independent tort as required for a claim of tortious interference with economic relations.  Opp. at 15-16.  Plaintiffs counter that Defendants' actions would be a breach of fiduciary duties, which is a permissible predicate tort for this claim.  Reply at 8-9.  The status of Guan as an employee versus owner of MC, and whether a duty was breached, is also in dispute, as discussed infra, Section III.e.  Given the competing evidence and versions of events, in particular as to the disputes around Guan's role at MC, the Court cannot decide as a matter of law whether Defendants tortiously interfered with Plaintiffs' prospective economic advantage.  This Court denies Plaintiffs' motion for summary judgment and declines to sua sponte grant summary judgment in favor of Defendants on this claim.

> **e.  No Party Is Entitled To Summary Judgment On The Breach-Of-Fiduciary-Duties Claim**

Plaintiffs argue that Guan and Weirong breached their duties to Lin and MC because, while they were employees of MC, they opened the businesses MCNY and MW that were direct competitors with MC.  See supra Section I.b.i.b; Memo. at 24-25.  Defendants respond that because this claim is based on a false allegation that Guan was an employee and officer of MC, and not a 50% shareholder of MC, this claim fails.  See supra Section I.b.ii.a; Opp. at 16. Plaintiffs respond that Guan can be both a shareholder and an employee, and that as Defendants

do not challenge Weirong's status as an employee of MC, they have waived any opposition to this claim with respect to her.  Reply at 9.

The Court finds that there are disputes of material fact that preclude summary judgment on this claim for any party.  Guan's status with respect to MC is in dispute, and what his exact duty was to MC cannot be determined as a matter of law.  The parties appear to agree that MW opened in 2015, that Weirong is the sole shareholder of the company, that it competed with MC and that Guan and/or Weirong owned and operated MW while working for MC.  See supra Section I.b.i.b.  Given that Guan's status at MC is in dispute, it cannot be determined if Weirong breached a duty to MC by operating a business that her husband, who claims he started MC and is a 50% shareholder at MC, also helped run.  See supra Sections I.b.ii.a-b.  If Guan helped own and operate MW with Weirong while serving as an owner of MC, it would be difficult to conclude that MC opposed the operating of MW.  As to MCNY, which Guan created in March 2017, Guan alleges he started this company when Lin began to sabotage MC and his partnership with Lin dissolved.  See supra Section I.b.ii.h.  Given the conflicting evidence and narratives, the Court is unable to determine who owed a duty to whom during which period of time.  As such, this Court denies Plaintiffs' motion for summary judgment and declines to sua sponte grant summary judgment in favor of Defendants on this claim.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied.  The Court also declines to <u>sua</u> <u>sponte</u> enter summary judgment in favor of Defendants.  On or before October 31, 2022, the parties are to file their joint Proposed Pretrial Order consistent with the Judge's Individual Rules.  If the parties seek a referral to Court-annexed mediation, they should submit a letter request for a referral.

Dated:  Brooklyn, New York
             September 22, 2022

*Vera M. Scanlon*

_____
VERA M. SCANLON
United States Magistrate Judge